The **NATIONAL LIFE AND ACCIDENT INSURANCE COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 7051.**

United States District Court, M. D. Tennessee, Nashville Division.

July 11, 1974.

James I. Vance Berry, Robins H. Ledyard, Nashville, Tenn., for plaintiff.

Charles H. Anderson, U. S. Atty., Nashville, Tenn., for defendant.

### MEMORANDUM

MORTON, District Judge.

Plaintiff in this action seeks from defendant a refund of $1,106,298.38 in Federal Income Taxes for years 1964, 1965 and 1966, plus statutory interest thereon. Defendant has asserted and plaintiff has admitted the validity of certain counterclaims and crossclaims of defendant against plaintiff, by way of setoff.

The matter was tried and argued to the Court on the basis of the pleadings (including exhibits) as amended by the Pre-Trial Order, the Stipulations of Facts and Exhibits agreed to by the parties, extracts from a deposition of Roland R. Strickert (including Exhibit 8 thereto) and the briefs of the parties.

The issue in this case is stated in the Pre-Trial Order as follows:

"Whether the ten percent deduction for increase in reserves on nonparticipating contracts provided by Section 809(d)(5), Internal Revenue Code of 1954 (1954 Code), could, to the extent the increase was due to a change in basis in computing such reserves, be taken in the year in which the change in basis occurred or whether the deduction had to be spread over a ten year period pursuant to Section 810(d)(1), 1954 Code."

Plaintiff urges the former construction while defendant urges the latter. In essence, the case is one of statutory construction.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

a) *General—Jurisdiction*

1. Plaintiff, The National Life and Accident Insurance Company, is and was at all times material to this proceeding a corporation duly incorporated and existing under the laws of the State of Tennessee and engaged in business as a "life insurance company" as defined in Section 801(a) of the Internal Revenue Code of 1954, as amended. Its principal office and place of business is in Nashville, Tennessee, within the Middle District of Tennessee.

2. Plaintiff timely filed its Federal Income Tax returns for each of the calendar years 1964 through 1966 with the District Director of Internal Revenue at Nashville, Tennessee, and paid the following taxes:

| Year | Tax |
|------|------|
| 1964 | $8,371,659.33 |
| 1965 | 7,902,726.64 |
| 1966 | 8,068,250.47 |

3. On or about December 20, 1968, the District Director of Internal Revenue at Nashville, Tennessee, assessed

certain deficiencies against plaintiff, which were paid, without admission of liability, on December 30, 1963, as follows:

| Year | Tax | Interest | Total Payment |
|------|-----|----------|---------------|
| 1964 | $243,188.76 | $54,917.35 | $298,106.11 |
| 1965 | 253,102.57 | 41,969.95 | 295,072.52 |
| 1966 | 385,529.08 | 40,797.42 | 426,326.50 |

4. On May 23, 1969, the District Director of Internal Revenue at Nashville, Tennessee, assessed certain additional deficiencies against plaintiff, which amounts were also paid, again without admission of liability, on June 13, 1969, as follows:

| Year | Tax | Interest | Total Payment |
|------|-----|----------|---------------|
| 1965 | $43,598.02 | $8,419.79 | $52,017.81 |
| 1966 | 55,093.46 | 7,482.90 | 62,576.36 |

5. On December 29, 1970, plaintiff filed with the District Director of Internal Revenue at Nashville, Tennessee, timely claims for refund of taxes for each of the years 1964 through 1966 in the following amounts, or in such greater amounts as might be allowed by law:

| Year | Amount of Claim |
|------|-----------------|
| 1964 | $298,106.11 |
| 1965 | 347,090.33 |
| 1966 | 428,139.75 |

6. By letter dated November 6, 1972, plaintiff received notice that its said claim for refund for the year 1964 had been disallowed in full and that its said claims for refund for 1965 and 1966 had been allowed in part, as follows:

| Year | Amount of Claim | Amount of Tax Allowed | Amount of Assessed Interest Allowed | Total |
|------|-----------------|-----------------------|-------------------------------------|-------|
| 1965 | $347,090.33 | $15,201.79 | $2,935.82 | $18,137.61 |
| 1966 | 428,139.75 | 8,507.77 | 1,155.54 | 9,663.31 |

7. Plaintiff has received payment of the above total amounts plus statutory interest and no longer has a claim with respect to the item which gave rise to such refunds. The payments were $22,178.57 for 1965 and $11,764.74 for 1966 (including statutory interest for both years).

8. Plaintiff's right to recovery in this proceeding is limited to the aggregate amount of its tax payments made by December 30, 1968, and June 13, 1969,

as aforesaid, reduced by the refunds allowed and paid as set forth above. Such amounts (before offsets and exclusive of statutory interest) are as follows:

| Year | Amount |
|------|--------|
| 1964 ............ | $ 298,106.11 |
| 1965 ............ | 328,952.72 |
| 1966 ............ | 479,239.55 |
| TOTAL | $ 1,106,298.38 |

b) *Terminology and Facts General in Nature*

9. Generally, a "reserve" is a dollar amount representing a person or company's estimate of future liabilities or obligations.

A "life insurance reserve" in life insurance company parlance is the amount by which the present value of future claims against a life insurance policy (or block of policies) exceeds the present value of future net premiums which the insurer will receive under the policy (or block of policies). Inasmuch as they represent obligations of the life insurance company, reserves are carried on the life insurance company's balance sheet as liability items. During early years, while any particular policy (or block of policies) remains in force the insurance company must increase its reserves annually, because the number of future premiums it may expect to receive decreases by one each year and the imminence of claim payment draws nearer each year. During later years an insurance company normally would reduce its reserves (on a net basis) on a block of policies since the reserves released by deaths of policyholders, or surrenders of policies, would normally exceed the premiums received on the block of policies.

In computing reserves for life insurance policies a company utilizes for the computation of each reserve:

a) an assumed interest rate;

b) a mortality table; and

c) a method.

The assumed interest rate utilized by the life insurance company is a rate of interest which, within a statutory maximum, the company can reasonably expect to earn during the period in which the policy (or block of policies) remains in effect.

A mortality table expresses, on the basis of the group studied, the probability that, of a number of persons of equal expectations of life who are living at the beginning of any year, a certain number of deaths will occur within that year.

Adoption of a "method" is the third and final step in computation of a reserve. The term "method" is a composite term and includes, but not by way of limitation, assumptions regarding:

a) when premium payments will be received (*e. g.*, at the beginning of a policy year or continuously throughout a policy year, in level amounts or in varying amounts); and

b) when claim payments will be paid (*e. g.*, at the ends of policy years, or during policy years as claims are submitted).

Out of premiums received, a life insurance company must set aside, on the basis of recognized mortality tables, a sum of money that must be invested so that, with the interest increment at a rate the company assumes it will earn annually over the lives of the policies, it will be able to meet its liability on those policies when the claims thereon arise. The calculation of the reserves held with respect to life insurance policies is an actuarial function and a reserve is the amount theoretically necessary to provide the funds with which to pay obligations under outstanding policies as they become due (because of surrender of the policy or death of the insured), provided the company's experience is in exact accord with the assumptions made. Any change in an actuarial assumption on which a life insurance company's reserves are based produces a different reserve, which may be either larger (or "strengthened"), or smaller (or "weakened"), than was the reserve based on the old assumption.

10. Reserve strengthening is one way in which a company's life insurance reserves are increased in a given year. Another way in which life insurance reserves are increased is through the addition of reserves for new policies written during the year. Reserves may also increase or decrease from one year to the next on a given block of insurance in force, due to mortality factors. Reserve increases caused by reasons other than reserve strengthening may be described as "normal reserve increases". While a life insurance company has considerable latitude to elect to strengthen its reserves, any election to strengthen reserves commits funds to pay benefits to policyholders. This in turn reduces the company's surplus or some account which could be converted to surplus, thereby reducing the amount of funds available for the payment of stockholder or policyholder dividends. Theoretically, a company could even impair its capital as a result of strengthening reserves. Reserve weakening, on the other hand, tends to increase surplus, or surplus-like accounts, but cannot be undertaken without the permission of the appropriate regulatory official. *E. g.*, Tenn.Code Ann. §§ 56-114, 56-115.

11. Plaintiff has elected not to write participating life insurance and all of plaintiff's life insurance contracts are nonparticipating. Nonparticipating insurance involves contracts written by stock life insurance companies in which the policyholders do not participate in company earnings and do not receive policyholder dividends, and is to be contrasted with participating contracts in which policyholders do participate in company earnings and may receive policyholder dividends. Participating contracts are typically written by mutual insurance companies. Participating and nonparticipating insurance may be further compared as follows: taking a given amount of life insurance for a particular individual, the annual premium for a participating contract will be substantially higher than the premium for the same type of insurance on a nonparticipating contract. The company writing participating contracts overcomes its competitive price disadvantage by offering the policyholder the prospect of future policyholder dividends which (i) can be returned directly to the policyholder; or (ii) can be used to reduce the premium; or (iii) can be used to purchase additional insurance.

12. The difference in premium amounts paid the company writing participating life insurance also gives that company a proportionately greater sum of money than the company writing nonparticipating business to fund policy reserves, or to meet unforeseen contingencies, and the difference is sometimes referred to as a "cushion of redundancy".

c) *Background Information*

13. The Court has reviewed legislative history [1] pertinent to the Life Insurance Company Income Tax Act of 1959 ("1959 Act"), 73 Stat. 112, Sections 801–820, Internal Revenue Code of 1954, as amended.[2] (A brief description

---

1. The Court's review included Hearings on H.R. 10021 Before the Senate Committee on Finance, 85th Cong., 2nd Sess. ("H.R. 10021 Hearings"); Hearings on Taxation of Income of Life Insurance Companies Before the Subcommittee on Internal Revenue of the House Committee on Ways and Means, 85th Cong., 2nd Sess. ("Life Company Tax Subcommittee Hearings"); the Report of the said Subcommittee ("Life Company Tax Subcommittee Report"); Hearings on H.R. 4245 Before the Senate Committee on Finance, 86th Cong., 1st Sess. ("H.R. 4245 Hearings"); S.Rep. 291, 86th Cong., 1st Sess. (1959), 1959-2 Code Cong. & Admin. News pp. 1575–1675; H.Rep. 34, 86th Cong.,

1st Sess. (1959); and Conf.Rep. 520, 86th Cong., 1st Sess. (1959). Following review the Court concludes that references to the "fantasy world of life insurance company accounting and taxation" in Great Commonwealth Life Ins. Co. v. United States, 491 F.2d 109 (5th Cir., 1973) quoting from Western Nat'l. Life Ins. Co., 51 T.C. 824, 830 (1968), are fully justified.

2. References hereinafter to a "Section" are uniformly references to a Section of the Internal Revenue Code of 1954, as amended through the tax years involved in this suit, unless otherwise expressly indicated.

of the tax pattern created by the 1959 Act may be found in the case of Atlas Life Ins. Co. v. United States, 381 U.S. 233, 85 S.Ct. 1379, 14 L.Ed.2d 358 (1965).) This Court's factual conclusions drawn from review are set forth in detail, along with references, in Appendix I to this opinion.

14. While none is essential to the Court's decision of this case, the Court reached several conclusions from review of legislative history,[3] as follows:

a) On the average, mutual life insurance companies were in stronger economic positions than were stock life insurance companies in 1959.

b) As mutual life insurance companies are owned by their policyholders, it seems logical to conclude that mutual companies would translate any tax advantage into a competitive pricing advantage either by reducing premiums or by increasing dividends. Congress seems to have accepted this conclusion and to have resolved to create a tax pattern which would not give either stock or mutual companies any decided tax advantage over the other.

c) The 1959 Act, even with the Section 809(d)(5) "nonpar" deduction as a part of it, shifted a portion of the traditional industry tax burden from mutual life insurance companies to stock life insurance companies.

d) Although considerable time and attention were given to the "nonpar" deduction during the H.R. 4245 Hearings, the Court found no indication as to how Congress intended that the "nonpar" deduction should operate in situations wherein reserve strengthening had taken place.

e) Immediately after enactment of the 1959 Act the average stock life insurance company had total funds available to meet contingencies which were smaller in amount than those which were held by the average mutual life insurance company to meet the same contingencies. From the legislative history it appears that the amount of the difference was approximately two and one-tenth percent (2.1%). Stated differently, it appears that to meet identical risks the average mutual life insurance company held approximately $102.10 for each $100.00 which the average stock life insurance company held. The source of this difference was the cushion of redundant premiums which the mutual company enjoyed but which the stock company did not. Inasmuch as policyholder dividends are deductible in determining gain from operations, the mutual company's cushion of redundant premiums provided a constant, tax free advantage. Moreover, while the "nonpar" deduction would tend to aid the average stock life insurance company move toward parity with the average mutual life insurance company, even dramatic reserve strengthening in and of itself would not provide the means by which parity might be achieved. A demonstration of this, in hypothetical form, is included within Appendix I.

d) *Specific Facts about Plaintiff's Reserve Strengthening*

15. Prior to 1964, plaintiff computed its life insurance reserves on the basis of recognized mortality tables, assumed rates of interest, and the assumption that death benefits are payable at the end of the policy year in which the death of the insured occurs. The Net Level Premium ("NLP") method was used. In 1964, plaintiff changed the latter assumption and began to assume that claims were paid as they arose. The new method was the Net Level Premium-Immediate Payment of Claims ("NLP–IPC") method. Plaintiff's change in assumption as to the time of payment of death benefits meant that under the NLP–IPC method claims would, on the average, be paid one-half year sooner than under the NLP method. As a result of this assumption by plaintiff, reserves were increased by an amount equal to one-half year's interest on the unstrengthened reserve.

---

3. A fuller explanation, along with citations, is found in Appendix I to this opinion.

16. The details of the 1964 reserve strengthening are as follows:

a) An interest adjustment factor was computed to reflect that plaintiff would be able to invest assets equal to reserves on its policies following its change to the Immediate Payment of Claims ("IPC") assumption for one-half year less on the average than it was able to do under the old basis.

b) Except for utilization of the interest adjustment factor, plaintiff made no other changes which would affect method of reserve calculation, mortality table or assumed interest rate during 1964.

c) The interest adjustment factor which plaintiff used was equal to the square root of the quantity $(1 + i)$, where the figure "i" represents the interest rate assumed with respect to any particular reserve.

d) Such factor was computed for each reserve that was strengthened by changing from the NLP to the NLP–IPC method.

e) Each reserve to be strengthened was determined by the NLP method, previously utilized by plaintiff, and by use of the applicable mortality table and interest rate, and was then multiplied by the interest adjustment factor to arrive at the new reserve for each group of policies.

f) The reserves calculated on December 31, 1964, on the NLP–IPC method—the new method—exceeded the reserve which plaintiff would have established had it continued its usage of the NLP method—the old method —by $11,379,635.00.

g) The increase in plaintiff's reserves in 1964 due to reserve strengthening was in the amount of $11,379,635.00.

h) The $11,379,635.00 increase in plaintiff's reserves due to reserve strengthening in 1964 was an increase in "life insurance reserves" as that term is defined in Section 801(b).

17. The $11,379,635.00 increase due to reserve strengthening in 1964 was attributable to nonparticipating life insurance contracts.

18. The difference between plaintiff's position and defendant's position on 1964 reserve strengthening may be clarified by a hypothetical, which constitutes Appendix II to this opinion.

19. In computing its life insurance reserves on certain policies for years before 1965, plaintiff used assumed rates of interest of three and one-half percent (3.50%) for certain classes of policies. During 1965 plaintiff: (i) reduced the above assumed interest rate to two and three-quarters percent (2.75%) on certain classes of policies and to two and one-half percent (2.50%) on certain other classes of policies; and (ii) changed certain of the mortality tables which it had theretofore utilized on such classes of policies. Lower rates of interest caused the required reserves to be proportionately larger since a greater sum of money was then needed to be set aside for the company to meet its future obligations, assuming that the money would yield a lower rate of return. The change in mortality tables, on the other hand, caused the reserves to be proportionately smaller because the rates of mortality were assumed to be lower in the new tables.

The net effect of such changes in assumptions was to produce larger reserves for plaintiff during 1965 than it would have held, had it not changed its assumptions. Plaintiff did in 1965 establish additional reserves consistent with the above changes in assumptions. The reserve increase in 1965 attributable to the above described changes in assumptions (i. e., the amount of "reserve strengthening") was in the amount of $14,177,417.00. The reserve increase of $14,177,417.00 for reserve strengthening was an increase in plaintiff's "life insurance reserves" as that term is defined in Section 801(b).

20. In computing its life insurance reserves on certain policies (other than

those on which reserves were strengthened during 1965) for years before 1966, plaintiff used assumed interest rates of three and one-fourth percent (3.25%). During 1966 plaintiff: (i) reduced the above assumed interest rate to two and three-fourths percent (2.75%) on certain classes of policies, and to two and one-half percent (2.50%) on certain other classes of policies; and (ii) changed certain of the mortality tables which it had theretofore utilized on certain classes of policies. The adoption of lower assumed rates of interest again caused the required reserves to be proportionately larger. The change in mortality tables, on the other hand, again caused the reserves to be proportionately smaller. The net effect of such changes in assumptions was to produce larger life insurance reserves for plaintiff during 1966 than it would have held, had it not changed its assumptions. In 1966 plaintiff established additional reserves consistent with the changes in assumptions. The reserve increase in 1966 attributable to the above changes in assumptions (*i. e.*, the amount of "reserve strengthening") was in the amount of $14,741,174.00. The reserve increase of $14,741,174.00 for reserve strengthening was an increase in plaintiff's "life insurance reserves" as that term is defined in Section 801(b).

21. An example which may serve to clarify the difference between plaintiff's and defendant's position on the amount of the Section 809(d)(5) deduction in 1965 and 1966 where there were increases in reserves due to a reduction in assumed rates of interest is set forth in Appendix III to this opinion.

22. As is indicated above, plaintiff for each of the years 1965 and 1966 changed certain of the mortality tables which it had theretofore utilized on certain classes of policies. The net effect of such changes in mortality tables was to produce decreases in reserves. For the years 1965 and 1966 the amount of weakening caused by changes in mortality tables was more than offset by the strengthening caused by the reductions

in interest rates. An example of the effect of a change in mortality tables on the amount of the Section 809(d)(5) deduction for an increase in reserves on nonparticipating contracts is set forth in Appendix IV to this opinion.

23. No issue of fact or law exists in this case with respect to the deductibility under Section 809(d)(5) of ten percent(10%) of plaintiff's reserve increases attributable to plaintiff's reserve strengthening and the only issue before this Court is the timing of such deductions.

### e) *Setoff Issues—General*

24. The defendant, as cross-plaintiff and as counter-plaintiff (the parties will hereinafter continue to be referred to by their original appellations of "plaintiff" and "defendant"), has raised and maintained three issues by way of setoff. Each such issue arises from a deficiency which the defendant has raised, but is barred from assessing by reason of the statute of limitations. No issue of fact or law exists in this case with respect to the defendant's right to set off judgment for plaintiff by the amounts of such barred deficiencies.

### f) *Setoff Issues—WSM Rent*

25. For 1964 WSM, Incorporated ("WSM"), which was during 1964 a wholly-owned subsidiary of plaintiff, but which is not a party to this suit, reported on its corporate tax return a deduction for rent on property leased from plaintiff in the amount of $668,358.11. Plaintiff reported a like amount as rental income on its 1964 return.

Pursuant to audit of WSM's 1964 return, the examining agent proposed a disallowance of $383,841.47 of rental expense claimed by WSM, and treated it as non-deductible dividend for purposes of calculating WSM's tax liability. The agent, who was also auditing plaintiff's 1964 return proposed that the amount of $383,841.47 be re-characterized in the hands of plaintiff as dividend income subject to the 85% dividends received deduction. The latter adjustment was

accepted by plaintiff. Following an Appellate Division conference between WSM and the Internal Revenue Service, however, $288,329.44 of the $383,841.47 amount of the proposed disallowance was allowed as a rental expense deduction to WSM. Defendant's right to collect taxes from plaintiff on the $288,329.44 that no longer was classified as dividend income and that should again have been characterized as rental income, and not subject to the 85% dividends received deduction, was barred by the statute of limitations, insofar as plaintiff was concerned, at the time of the agreement between WSM and the defendant.

Consistent with the disposition of the WSM case, plaintiff and defendant have agreed that plaintiff's dividend income for purposes of application of the dividends received deduction in 1964 should have been $288,329.44 less than was allowed, and that plaintiff's rental income for 1964 should have been increased in a like amount.

### g) *Setoff Issues—Reserve Strengthening*

26. The deductions taken by plaintiff under Section 809(d)(5) and permitted by the Internal Revenue Service for 1965 and 1966, equal to one-tenth of the deduction under Section 809(d)(2) attributable to strengthening in 1964, and the similar partial deduction taken in 1966 for reserve strengthening in 1965, are not allowable.

### h) *Setoff Issues—Contingency Reserves*

27. (a) In computing "gain from operations" on its 1964, 1965 and 1966 tax returns, plaintiff deducted, among other deductions, the annual increases in the two following categories of reserves: "Group Accident and Health Contingency Reserves ('Group A & H Contingency Reserves')" and "Cash Value Excess Reserves". The year end balance for each such reserve from December 31, 1963, through December 31, 1966, was as follows:

| *RESERVE* | *12–31–63* | *12–31–64* | *12–31–65* | *12–31–66* |
|---|---|---|---|---|
| Gp. A & H Cont. Res. | $61,324.00 | $83,904.00 | $105,988.00 | $130,052.00 |
| Cash Val. Ex. Res. | 0 | 0 | 28,264.00 | 27,484.00 |

(b) The aggregate net annual increase for the two categories of reserves was:

| *YEAR* | *AMOUNT* |
|---|---|
| 1964 | $22,580.00 |
| 1965 | 50,348.00 |
| 1966 | 23,284.00 |

(c) Plaintiff deducted the annual increase in the aforesaid "Group A & H Contingency Reserves" as an increase in unearned premium or unpaid loss reserves within the meaning of Section 810(c)(2). Such reserves are not Section 810(c)(2) reserves and the increase in such reserves is not deductible.

(d) Plaintiff deducted the annual increases in "Cash Value Excess Reserves" as increases in life insurance reserves within the meaning of Section 810(c)(1). Such reserves are not Section 810(c)(1) reserves and are not to be treated as such in calculating taxes.

### i) *Setoff Issues—Required Interest*

28. Defendant raised, but has abandoned, a claim for setoff regarding the computation of reserves in computing "required interest" under Section 809(a)(2).

## CONCLUSIONS OF LAW

### a) *General*

1. The Court has jurisdiction over this action under 28 U.S.C. Section 1346(a)(1).

2. Venue is proper.

### b) *The Tax Pattern in Controversy and General Considerations*

3. This Court recognizes that "The propriety of a deduction does not turn upon general equitable considerations, such as a demonstration of effective economic and practical equivalence. Rather, it 'depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed.' New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934); Deputy v. du Pont, 308 U.S. 488, 493, 60 S.Ct. 363, 84 L.Ed. 416 (1940)." Commissioner of Internal Revenue v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974). In the instant case, however, deductibility is not in issue; only the timing of the deduction is in issue. Thus, while this Court does not repudiate the principles hereinabove quoted, it does find that neither principle is in issue in this case.

4. Congress established a pattern whereby a life insurance company is allowed to deduct under Section 809 certain reserve increases in the process of calculating its "gain from operations".

5. Insofar as *participating* policies are concerned:

i) normal reserve increases are deductible in full under Section 809(d)(2) in the year of increase;

ii) reserve increases attributable to reserve strengthening are deductible in full under Section 809(d)(2), subject to the spread rule[4]; and

iii) Section 809(d)(5) provides no deduction whatsoever for either type of reserve increase.

6. Insofar as *nonparticipating* policies are concerned:

i) normal reserve increases are deductible in full under Section 809(d)(2) in the year of increase;

ii) reserve increases attributable to reserve strengthening are deductible in full under Section 809(d)(2), subject to the spread rule;

iii) in addition to the Section 809(d)(2) deduction, an amount equal to ten percent (10%) of normal reserve increase in certain life insurance reserves is deductible under Section 809(d)(5) in the year of increase;

iv) in addition to the Section 809(d)(2) deduction, an amount equal to ten percent (10%) of the increase attributable to reserve strengthening is deductible in full under Section 809(d)(5), either under plaintiff's theory or under the Government's theory, each of which deals with the timing of the deduction and not the ultimate availability of the deduction.

### c) *Reserve Strengthening Deduction*

7. Validity of the last sentence of Treas.Reg. § 1.809–5(a)(5)(iii) is in issue in this case. The regulation provides (in pertinent part):

"In the case of the adjustments required by section 810(d) (relating to adjustment for change in computing reserves), the increase in life insurance reserves attributable to reserve strengthening shall be taken into account in accordance with the rules prescribed in section 810(d) and § 1.-810–3."

8. Treasury Regulations must be sustained if they implement the congressional mandate in some reasonable

---

4. Section 810(d)(1).

manner, but that principle sets the framework for judicial analysis and does not displace it. A regulation which is unrealistic and unreasonable is invalid. United States v. Cartwright, 411 U.S. 546, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973). An income tax regulation cannot take away a benefit conferred by the Internal Revenue Code. Brooks v. United States, 473 F.2d 829 (6th Cir. 1973) aff'g 339 F.Supp. 1031 (M.D.Tenn. 1971); Dorfman v. Commissioner of Internal Revenue, 394 F.2d 651 (2nd Cir. 1968). Nor may the Commissioner add a restriction to the statute which is not contained in the statute. Smith v. Commissioner of Internal Revenue, 332 F.2d 671 (9th Cir. 1964). Moreover, the case of International Trading Co. v. Commissioner of Internal Revenue, 484 F.2d 707 (7th Cir. 1973) stands for the proposition:

"However much the statute, in operation, may offend the Commissioner's sense of symmetry and propriety, we cannot say that the results it causes are either absurd or unintended by Congress. Courts have no power (just as the Commissioner has no power in his capacity as an administrative official) 'to rewrite legislative enactments to give effect to' their 'ideas of policy and fitness or the desirability of symmetry in statutes.' United States v. Shirah, 4 Cir., 253 F.2d 798, 800 (1958). The powers of repeal and amendment are uniquely legislative in their nature." (Taken by the court from Busse v. Commissioner of Internal Revenue, 479 F.2d 1147 (7th Cir. 1973).)

The determination of whether or not Treas.Reg. § 1.809–5(a)(5)(iii) is a valid administrative interpretation of the relevant provisions of the Internal Revenue Code requires review of such relevant provisions.

9. Section 809(d)(5), permits a special deduction to a life insurance company in computing its "gain from operations" in an amount equal to the greater of ten percent (10%) of the increase in life insurance reserves on certain nonparticipating contracts, and three percent (3%) of premiums received on such contracts. Section 809(d)(5) does not distinguish between normal reserve increases and increases attributable to reserve strengthening. In its entirety, Section 809(d)(5) provides:

"d) *Deductions*—For purposes of subsections (b)(1) and (2), there shall be allowed the following deductions:

\*　　\*　　\*　　\*　　\*　　\*

"(5) *Certain Nonparticipating Contracts*—An amount equal to 10 percent of the increase for the taxable year in the reserves for nonparticipating contracts or (if greater) an amount equal to 3 percent of the premiums for the taxable year (excluding that portion of the premiums which is allocable to annuity features) attributable to nonparticipating contracts (other than group contracts) which are issued or renewed for periods of 5 years or more. For purposes of this paragraph, the term 'reserves for nonparticipating contracts' means such part of the life insurance reserves (excluding that portion of the reserves which is allocable to annuity features) as relates to nonparticipating contracts (other than group contracts). For purposes of this paragraph and paragraph (6), the term 'premiums' means the net amount of the premiums and other consideration taken into account under subsection (c)(1)."

10. Section 810(d)(1) establishes a "spread rule", the effect of which is to require a life insurance company which increases or decreases those reserves described in Section 810(c) by changing one or more of the bases used in determining reserves (*i. e.*, reserve strengthening or reserve weakening) to take the effect of such change into account for certain purposes over a ten year period beginning the year next following the year in which the taxable event occurs.

In its entirety Section 810(d)(1) provides:

"(d) *Adjustment for change in computing reserves*—

(1) In general.—If the basis for determining any item referred to in subsection (c) as of the close of any taxable year differs from the basis for such determination as of the close of the preceding taxable year, then so much of the difference between—

(A) the amount of the item at the close of the taxable year, computed on the new basis, and

(B) the amount of the item at the close of the taxable year, computed on the old basis,

as is attributable to contracts issued before the taxable year *shall be taken into account for purposes of this subpart* as follows:

(i) if the amount determined under subparagraph (A) exceeds the amount determined under subparagraph (B), 1/10 of such excess shall be taken into account, for each of the succeeding 10 taxable years, *as a net increase to which section 809 (d)(2) applies;* or

(ii) if the amount determined under subparagraph (B) exceeds the amount determined under subparagraph (A), 1/10 of such excess shall be taken into account, for each of the succeeding 10 taxable years, *as a net decrease to which section 809(c)(2) applies.*" (Emphasis supplied.)

◼ 11. When a Congressional statute is clear and straightforward, reference to legislative history is neither necessary nor permitted. Easson v. Commissioner of Internal Revenue, 294 F.2d 653 (9th Cir. 1961); Miller v. Bank of America, 166 F.2d 415 (9th Cir. 1948). Even where doubt exists, a statute is not to be extended by implication

or enlarged by construction so as to embrace matters not specifically covered therein. Mead Corp. v. Commissioner of Internal Revenue, 116 F.2d 187 (3rd Cir. 1940).

◼ 12. Nothing in Section 809(d) (5) manifests Congressional intent to subject the deductibility of that portion of reserve increase attributable to reserve strengthening to the deferral provisions of the spread rule established by Section 810(d)(1). In fact, when analyzed, the plain language of Section 809(d)(5) expresses Congressional intent not to subject deductions for such reserve increases to deferral. Several items reinforce this conclusion, as follows:

a) To the extent that Congress intended that Section 809(d)(5) be less than self-contained Congress used a term elsewhere defined (*i. e.*, "life insurance reserves" which is defined by Section 801(b)(1)), or terms of generally cognizable significance in the business of life insurance, or specifically provided that the term would have the meaning assigned to it by another Code Section (*i. e.*, the term "premiums" as that term is used in Section 809(d)(5), is made specifically subject to the provisions of Section 809(c)(1)). Congress did not expressly subject the "ten percent of reserve increase" deduction of Section 809(d)(5) to the spread rule established by Section 810(d)(1). The absence of Congressional action on this point is particularly significant in light of the fact that Sections 809(d)(2) and 809(c)(2) were expressly subjected to the provisions of Section 810.

b) The words "for the taxable year" appear twice in Section 809(d)(5). In the first instance these words appear in association with the "ten percent of reserve increase" deduction and in the second these words appear in association with the "three

percent of premiums" deduction. In each instance the words "for the taxable year" connote deductibility in the year in which the taxable event occurs (*i. e.*, reserve increase, whether normal or attributable to strengthening, on the one hand, or receipt of premiums, on the other). This conclusion is reinforced by the appearance of similar or identical words in subsections (1), (3), (incorporated by reference from Section 811(b)) and (6) of Section 809(d). In each instance above cited, except for reserve strengthening which is the subject of this action, no question exists but that the deduction may be taken in the year in which the taxable event occurs, subject to the limitations of Section 809(f) (where applicable).

13. Similarly, no expression of intent to subject the reserve strengthening portion of reserve increase deductions under Section 809(d)(5) appears in Section 810(d)(1). In fact, from the plain language of Section 810(d)(1) it is apparent that the intent of Congress was not to subject Section 809(d)(5) to Section 810(d)(1) since Section 810(d)(1) is limited by its own language to "increases to which Section 809(c)(2) applies" and to "decreases to which Section 809(d)(2) applies".

14. Section 815(c)(2)(B) contains a reference to the deduction provided by Section 809(d)(5). The reference is followed by the parenthetical "(as limited by section 809(f))". Section 809(f) expressly applies to Section 809(d)(5). Section 815(c)(2)(B) contains no similar reference to any restriction imposed on the Section 809(d)(5) deduction by Section 810(d)(1). Congress was fastidious, not sloppy, in the quality of

draftsmanship exhibited in Subchapter L, so as to make decipherable a rather technical portion of the Code. In light of all of the cross-referencing found in Subchapter L it cannot be fairly said that the deduction provided by Section 809(d)(5) was subordinated to Section 810(d)(1) in the absence of specific expression of intent to subordinate made manifest in some form or another, as by cross reference. No such manifestation exists.[5]

15. Viewed as a whole, the legislative history surrounding the enactment of Subchapter L gives positive indication that Congress intended that the spread rule established by Section 810(d)(1) should not apply to the special deduction afforded by Section 809(d)(5) for several reasons, as follow:

a) S.Rep. 291, 86th Cong., 1st Sess., U.S.Code Cong. & Admin.News p. 1575, at 1597, states that the purpose of Section 809(d)(5) is to grant companies issuing nonparticipating insurance a "cushion" similar to that provided under Section 811 for companies issuing participating insurance. The policy dividends paid deduction provided by Section 811 is not spread over a ten year period but is deductible in the year in which the taxable event occurs.

b) In the same Report, at pages 1608–09, U.S.Code Cong. & Admin. News, the Senate Finance Committee explained the spread rule and expressed concern about possible tax distortion. The Senate Finance Committee's technical explanation of the spread rule is found at pages 1632–33, U.S.Code Cong. & Admin.News. An

5. Expressions of Congressional concern about possible distortions of tax (*e. g.*, S.Rep. 291, 1959–2 Code Cong. & Admin.News, pp. 1608 and 1633) appear to be limited in scope to the deduction for reserve increases under Section 809(d)(2). References to the application of the Section 810(d)(1) spread rule imply its application to a "deduction" (presumably under Section 809(d)(2)), not to "deductions", by spreading the amount which would otherwise be deductible in the year of strengthening as a series of ten deductions beginning in the year next following the year in which strengthening takes place.

example of application (and nonapplication) of the spread rule is found at page 1633, U.S.Code Cong. & Admin. News, and is set forth below:

"

|  | Jan. 1 | Dec. 31 |
|---|---|---|
|  | 1960 | 1960 |
| Book reserves at 3 percent assumed rate, Commissioner's reserve valuation method | $200 | $210 |
| Reserves at 3 percent assumed rate, after restatement under Sec. 818(c) | 220 | 231 |
| Strengthened reserves 2 percent assumed rate and net level premium method | —— | 255 |

The company's deduction for the year 1960 with respect to these reserves would be the difference between $220 and $231 or $11 because of the deduction previously made. The amount to be spread over the following 10 years would be the difference between $255 and $231 or $24."

Two items of particular significance may be drawn from the above example, as follows:

a) the spread rule in the example is applied as it would be to the deduction under Section 809(d)(2) and not to the deduction under Section 809(d)(5); and

b) the deduction of $11.00 exempted by Section 810(d)(3) from application of the spread rule, and specifically intended by Congress to be fully deductible in the year of increase, is approximately four and one-half times as large as the deduction of $2.40 allowed by Section 809(d)(5).

In context, the expression of Congressional concern about possible tax distortion was clearly limited to tax distortion attributable to certain reserve strengthening deductible under Section 809(d)(2). This amounted to $24.00 in the above example. Congress clearly intended to allow $11.00 of strengthening as a deduction in the year of strengthening by reason of Section 810(d)(3). This Court concludes that Congress did not intend that the deduction of ten percent (10%) of reserve strengthening ($2.40) would cause such distortion of taxes as to cause it to be subjected to the "spread rule".

The court in Jefferson Std. Life Ins. Co. v. United States, 408 F.2d 842 (4th Cir. 1969), cert. denied 396 U.S. 828, 90 S.Ct. 77, 24 L.Ed.2d 78 (1969), correctly observed:

"Reason would seem to indicate that the spread rule was to come into play only when the deduction was more substantial in nature."

16. The holding in the case of Jefferson Std. Life Ins. Co. v. United States, *supra,* is directly on point. In that case the court held:

"From the reference in § 809(d)(2) to Section 810, the absence of such a reference in § 809(d)(5), we conclude that the 'spread rule' prescribed by § 810(d) is not applicable to the special deduction for strengthening reserves for nonparticipating contracts permitted by § 809(d)(5)."

17. The last sentence of Treas. Reg. § 1.809–5(a)(5)(iii) is invalid since it is unreasonable, plainly inconsistent with the revenue statutes, imposes a restriction not contained in the statute and attempts to deprive plaintiff of a statutory benefit (*i. e.,* immediate

deductibility). Jefferson Std. Life Ins. Co. v. United States, *supra*; Brooks v. United States, *supra*. Section 809(d)(5) grants a deduction and neither statutory provision nor valid regulation requires that the benefit thereof must be deferred. The deduction may, therefore, be claimed in its entirety in the year in which the taxable event occurs.

*Summary*

18. Plaintiff is entitled to a refund of taxes in the amounts of:

| Year | Amount |
|------|--------|
| 1964 | $ 298,106.11 |
| 1965 | 328,952.72 |
| 1966 | 479,239.55 |
| TOTAL | $1,106,298.38 |

plus interest as provided by statute.

19. The refund described and set forth above shall be decreased by the amounts of taxes that would have been assessed and collected had the revenue agents who audited plaintiff's return acted in accordance with this Court's findings on: (a) the WSM rent; (b) reserve strengthening deducted and allowed in 1965 and 1966; and (c) the contingency reserves. Such setoffs shall be used to set off defendant's liability to plaintiff before the addition of interest as provided by statute, and statutory interest shall be applied to the balance.

20. Plaintiff shall compute the amount of refund due plaintiff, subject to the review and approval of the defendant, and to the review and approval of this Court should the parties disagree. Judgment shall be entered for plaintiff in the amount of refund, less setoffs, plus statutory interest. Costs of this case shall be assessed against the parties pro rata, computed on the basis of plaintiff's percentage of recovery to the amount demanded in the complaint.

### APPENDIX I

Since 1909 life insurance companies have been subjected to Federal tax either measured by income or directly upon income. Each such Federal tax has recognized that life insurance policies are long term contracts with respect to which the life insurance company incurs future obligations as a result of the receipt of current income, in the form of premiums, by allowing the company a deduction in some form or another for increases to its reserves.

From 1921 until the 1959 Act became effective life insurance companies were taxed on "free investment income" which was determined in several different ways during the period. Conceptually, "free investment income" was that portion of a life insurance company's investment income which was in excess of the amount by which the company must increase its reserves to conform with law.[1]

Taxation of life insurance companies is a complex subject conceptually and one to which it is manifest that the Department of the Treasury and the Congress of the United States devoted considerable time and study from approximately 1955 until enactment of the 1959 Act. In addition to the Committee Reports, the Court found helpful the transcripts of three hearings held before two Congressional Committees and one Subcommittee in 1958 and 1959. These were Hearings on H.R. 10021 Before the Senate Committee on Finance, 85th Cong., 2nd Sess.; Hearings on Taxation of Income of Life Insurance Companies Before the Subcommittee on Internal Revenue Taxation of the House Committee on Ways and Means, 85th Cong., 2nd Sess. .(including the Subcommittee Report); and Hearings on H.R. 4245 Before the Senate Committee on Finance, 86th Cong., 1st Sess. References in subsequent paragraphs to excerpts from the above hearings will be to "H.R. 10021 Hearings", "Life Company Tax Subcommittee Hearings" (or to "Life Company Tax Subcommittee Report", if applicable) and to "H.R. 4245 Hearings", respectively.

1. E. g., Tenn.Code Ann. §§ 56–114, 56–115.

Life insurance companies receive income from investments net of expenses of production and maintenance. Some of this income is used to fund increases in reserves and the remainder, if any, is profit to the insurance company. This is, quite obviously, a form of financial leverage which operates in the insurer's favor so long as the insurance company's net investment income exceeds the amount of interest which the insurer must credit to reserves. The various tax patterns in effect from 1921 until enactment of the 1959 Act had as their principal purpose the identification of the amount of favorable financial leverage, so that it might be taxed. Just as obviously, leverage would work against the insurer in years when the insurer's net investment income was insufficient to cover the amount by which the insurer must credit reserves.

Under the pattern created under the 1942 Internal Revenue Bill, 56 Stat. 867 ("1942 Act"), free investment income was determined by resort to a "secretary's ratio" the effect of which was arbitrarily to assume that a life insurance company's reserve interest requirements were three and one-fourth percent (3.25%) on sixty five percent (65%) of its reserves and the average rate earned by the industry on the remaining thirty five percent (35%) of its reserves. Investment earnings above this rate were deemed to be "free" (of policyholder reserve interest claims) and were subject to taxation. During early post World War II years interest rates declined dramatically and insurance companies in 1947 and 1948 paid no taxes resulting from the transaction of life insurance business. The first of a series of so-called stopgap measures was enacted in 1950. The stopgap measures divided net investment income, without regard to its level, into an arbitrary portion which was deductible as being committed to reserves and a portion which was taxable as free investment income. The stopgap measures were never permanent but were re-enacted annually, sometimes on a retroactive basis (*e. g.,* the 1950 stop-

gap measure applied to 1949 tax, and the 1958 stopgap measure applied to 1957). The 1942 Act was not repealed by any stopgap measure but was merely deferred by each such measure for another year. By 1958, when the last of the stopgap measures was enacted, interest rates had increased and life insurance companies were once again enjoying the benefit of favorable financial leverage. The degree of such leverage was sufficiently pronounced as to make it far more favorable for life insurance companies to be taxed under the stopgap measure then in effect than under the 1942 Act. The financial community, the media, the Department of the Treasury and members of Congress were aware of the fact that Congress was enacting tax relief measures annually, and sometimes retroactively, in favor of life insurance companies during a period in which no comparable tax relief was being granted to taxpayers generally. H.R. 10021 Hearings, pp. 2–24, 48–51, 61–62, 106. Life Company Tax Subcommittee Hearings, p. 100.

H.R. 10021 was enacted in 1958 and was the last stopgap measure so enacted.

A group of mutual companies banded together informally as the Temporary Committee on the Taxation of Mutual Life Insurance Companies ("Temporary Committee") during the spring of 1956. On April 10, 1958, the Department of the Treasury advised Chairmen of the House Ways and Means and Senate Finance Committees (Cong. Mills and Sen. Byrd) that the appropriate life insurance company Federal Income Tax base should be total income, including underwriting profits as well as investment income. Shortly thereafter, the Temporary Committee formally organized, registered as a lobbyist, came to agreement on the terms and conditions of a bill and secured introduction of H.R. 13707 (captioned "A BILL Relating to the taxation of income of *mutual* life insurance companies" (emphasis supplied)) which purported to tax the total income of mutual life insurance companies. Life Company Tax Subcommittee Hearings, pp. 95–99.

The Department of the Treasury opposed H.R. 13707 because "It incorporates a series of special deductions from net operating gain which, on study, do not appear to have clear business justification." Life Company Tax Subcommittee Hearings, p. 19. Testimony of mutual company representatives before the Subcommittee favored H.R. 13707 as establishing a fair and equitable method of taxing mutual life insurance companies (a representative statement is found at Life Company Tax Subcommittee Hearings, pp. 95–182). Numerous stock company representatives criticized H.R. 13707 during the hearings, principally on the grounds that the bill granted tax advantages to mutual companies which the mutual companies would translate into competitive advantages (a representative statement is found at Life Company Tax Subcommittee Hearings, pp. 48–94). The Life Company Tax Subcommittee Report states at p. 7:

> "Your subcommittee recognizes that if underwriting income is made a significant factor in the tax base developed for life insurance companies, a serious competitive problem might arise between stock and mutual life insurance companies . . . ."

In its conclusions, at Life Company Tax Subcommittee Report, pp. 8–9, the Subcommittee concluded that H.R. 13707 created competitive problems in that it favored mutual life insurance companies, expressed concern that the Department of the Treasury proposal did the same and requested Treasury and Committee staffs to iron out the problems. Neither the Department of the Treasury bill nor H.R. 13707 contained a counterpart to the Section 809(d)(5) "nonpar deduction" at the time of the Subcommittee Report. Congress did not enact either

bill and each "died" upon expiry of the Eighty Fifth Congress.

H.R. 4245 which with amendments became the 1959 Act was introduced early in the First Session of the Eighty Sixth Congress. Following passage of H.R. 4245 by the House, the Senate Committee on Finance heard six days of testimony on H.R. 4245 during March of 1959. At introduction and at the time of hearings the Section 809(d)(5) "nonpar" deduction was a part of H.R. 4245, although it was then located at Section 809(d)(6) and did not contain the "three percent of premiums" alternative deduction. Mutual company spokesmen in their testimony before the Committee generally ignored the "nonpar" deduction [2] and addressed themselves to other matters. A representative mutual company statement appears at H.R. 4245 Hearings, pp. 92–106. The testimony of stock company representatives generally was directed at the impropriety of taxing underwriting gains at all for competitive reasons and the absolute necessity for allowing a "nonpar" deduction of at least ten percent (10%), preferably more, if Congress determined that underwriting gains should be taxed. A representative stock company statement appears at H.R. 4245 Hearings, pp. 550–70.

Committee Reports accompanying H.R. 4245 make it abundantly clear that the "nonpar" deduction was included in the bill in an attempt to deal with the competitive problem between stock and mutual life insurance companies.[3] E. g., S.Rep. 291, 86th Cong. 1st Sess. (1959) U.S.Code Cong. & Admin.News 1959–2, pp. 1584–86. It is clear from the same report that stock life insurance companies would be expected to pay approximately thirty one percent (31%) of in-

2. The exception appears at H.R. 4245 Hearings, pp. 668–70. The "nonpar" deduction was also criticized, along with several other facets of the bill, by a professor of economics speaking as a policyholder and taxpayer. H.R. 4245 Hearings, pp. 646–54.

3. As mutual companies are owned by their policyholders Congress seems to have con-

cluded that mutual companies would translate any tax advantage into a pricing advantage either by reducing premiums or by increasing dividends. Certainly, numerous stock company representatives urged during hearings that such could be expected to occur if Congress gave mutual companies any overall tax advantage relative to stock companies.

dustry tax under the 1959 Act whereas they would have paid only approximately twenty five percent (25%) of industry tax had the 1942 Act become effective by reason of Congressional inaction and that a portion of the traditional tax burden was in effect shifted from mutual companies to stock companies by the 1959 Act. *Id.* G. Revenue Effect, p. 1586.

Nowhere in the Committee Reports, floor debates or hearings did the Court find any explanation of exactly how Congress intended that the "nonpar" deduction should operate in practice to achieve parity nor did the Court find how Congress intended the "nonpar" deduction to operate in a situation in which reserve strengthening had taken place. However, from the Committee Reports and from the transcripts of the hearings it is possible to postulate a hypothetical demonstration of how the "nonpar" deduction operates in practice with respect to a representative stock company and a representative mutual company. To do so one must accept as factual and accurate the following:

a) As of enactment of the 1959 Act mutual life insurance companies on the average carried "stronger"[4] reserves than did stock life insurance companies, again on the average, because mutual companies had strengthened reserves by adopting more conservative assumed interest rates in the period 1945–1950. Life Company Tax Subcommittee Hearings, pp. 56, 58. It seems that the average assumed interest rate for mutual companies in 1959 was on the order of two to two and one-half percent (2–2.5%). *Id.*, at 56. Stock companies, on the other hand, had on the average assumed interest rates on the order of three to three and one-half percent (3–3.5%). *Id.*, at 59, H.R. 4245 Hearings p. 630.[5] It would seem that assuming a stock company average reserve interest rate of three and two-tenths percent (3.2%) and a mutual company average reserve interest rate of two and one-half percent (2.5%) would not miss the mark by far.

b) A recognized rough rule of thumb for determining the effect of changes in reserve interest assumptions is that for every one percent (1%) by which reserve interest rates are changed the reserve will be changed by ten percent (10%). H.R. 4245 Hearings, p. 176. Thus, for example, a reserve calculated on an assumed rate of interest of two

---

4. A "stronger" or larger reserve results from the adoption of more conservative assumptions. In the instant case plaintiff adopted more conservative assumptions of two types. During 1964 it changed its assumption as to when claims would be paid, assuming they would be paid earlier than it had theretofore assumed, which carried along with it the assumption that it would have the use of money for a shorter period. During 1965 and 1966 plaintiff strengthened reserves by reducing certain of its reserve interest rates.

5. The assumption of three and two-tenths percent (3.2%) for stock companies may be too low since the statement was delivered on behalf of an organization representing 278 companies having more than ninety five percent (95%) of insurance in force in the United States. According to Treasury Department testimony delivered during the H. R. 10021 Hearings approximately 1350 life insurance companies did business in the United States during 1958. The approximately 1072 companies which were not members of the organization on behalf of which this statement was delivered, although they comprised approximately seventy five percent (75%) of the number of companies doing a life insurance business in the United States, had captured less than five percent (5%) of the market and may be considered collectively as small companies. A definite correlation seems to have existed between size of company and conservatism in interest rate assumptions with the larger companies (mostly mutual companies) adopting more conservative reserve interest rate assumptions than were adopted by smaller companies, but legislative history does not clearly indicate just what reserve interest rate assumptions these smaller companies had adopted. Apparently, though this is not clear from the hearing transcripts, many of these companies wrote types of business on which reserves are not of significance (referred to in the transcripts as "specialty business").

and one-half percent (2.5%) would be expected to be approximately seven percent (7%) greater than a reserve calculated on an assumed rate of interest of three and two-tenths percent (3.2%). (3.2%–2.5% = 0.7 × 10 = 7%).

c) At or around enactment of the 1959 Act mutual companies retained surplus equal, on the average, to approximately seven percent (7%) of their reserves. H.R. 4245 Hearings, p. 629. Stock companies, on the other hand, retained surplus equal on the average to approximately fourteen percent (14%) of their reserves. *Id.* Any advantage which stock companies enjoyed by reason of carrying larger surplus was removed to the extent that mutual companies carried larger reserves and, if the mutual company average reserves for equivalent risks exceeded those carried by stock companies by an amount on the order of seven percent (7%), as it appears they did, stock companies and mutual companies had roughly equal amounts of reserves and surplus with which to meet roughly equivalent risks.

d) In addition to its larger reserves, the average mutual life insurance company in 1959 held a cushion of redundancy generated by excess premium charges [6] equal to approximately thirty percent (30%) of surplus. *Id.* Stated differently, this excess premium or cushion of redundancy was equal to approximately two and one-tenth percent (2.1%) of the average mutual life insurance company's reserves (30% × 7% = 2.1%). Following enactment of the 1959 Act the average stock company did not hold an equivalent to this cushion

of redundancy.[7] S.Rep. 291, *supra*, at 1597. The mutual company would normally pay back this premium overcharge to the policyholder in the form of a dividend if business went well. If matters did not go well, the mutual company could use the cushion of redundancy to offset losses.[8]

In addition to acceptance of the foregoing, the following assumptions are necessary in postulating the hypothetical:

a) A stock life insurance company and a mutual life insurance company have written identical risks and follow the patterns assumed to be roughly average for their form of conducting a life insurance business. The mutual company's reserve interest rate is two and one-half percent (2.5%). The stock company begins the year with a reserve interest rate assumption of three and two-tenths percent (3.2%) and "strengthens" reserves during the year by reducing its interest rate to two and one-half percent (2.5%). The increase in the stock company's reserves as a result of this strengthening was seven percent (7%) under the ten-for-one rule discussed above. The stock company's surplus in the hypothetical is reduced by the amount of strengthening.

b) As of the beginning of the year the stock company's surplus was equal to fourteen percent (14%) of its reserves; the mutual company's surplus was equal to seven percent (7%) of its reserves.

c) Neither company experienced increase or decrease in reserves during the year attributable to any cause other than reserve strengthening.

---

6. The excess premium is released to the policyholder at the end of each policy year in one of several methods. However, upon its release another premium is due and the practical effect is that the mutual life insurance company enjoys a constant cushion of redundancy.

7. The hearing transcripts indicate that some stock companies wrote participating business, but this seems to have been the exception rather than the norm.

8. Examples of business not going well which were cited with frequency during hearings were the Spanish Influenza epidemic of 1918–19, which dramatically increased mortality, and the depression of the 1930s during which frequency of policy surrenders and loans increased at a time when underlying asset values were depressed. A less frequently cited risk was that of nuclear war.

d) The stock company's reserves qualified as "life insurance reserves" for purposes of Section 809(d)(5) and the stock company's level of profit was such as would allow it to receive full benefit from the "nonpar" deduction. The effect of 1959 profits on 1959 year end surplus has, however, been ignored for both the stock and the mutual company.

e) All of the mutual company's insurance is participating while all of the stock company's business is nonparticipating.

f) All calculations reflect rounding.

g) The cushion of redundancy for the stock company is calculated under plaintiff's theory of law. Were the defendant's theory correct the cushion would be $ –0– at the end of 1959 and would increase by $6.50 per year for each of the next ten years (1960–1969, inclusive).

| Year | Mutual Company | | | Stock Company | | |
|------|---------|---------|---------|---------|---------|---------|
| | Reserve | Surplus | Cushion | Reserve | Surplus | Cushion |
| End of 1958 | $10000 | $700 | $210 | $9350 | $1310 | –0– |
| Beginning of 1959 | 10000 | 700 | 210 | 9350 | 1310 | –0– |
| End of 1959 | 10000 | 700 | 210 | 10000 | 660 | $65 |

### APPENDIX II

The difference in plaintiff's position and defendant's position for 1964 reserve strengthening is below demonstrated in the form of a hypothetical.

(a) Assume non-participating whole life contract in the amount of $1,000 issued in the year 1950 for a male, age 35, based on the 1941 Commissioner's Standard Ordinary mortality table with interest at 3 percent. Assume also that the December 31, 1963, reserve was calculated according to the Net Level Premiums (NLP) method and that the December 31, 1964, reserve was calculated according to the Net Level Premium-Immediate Payment of Claims (NLP–IPC) method.

(b) Computation

| | | NLP | NLP–IPC |
|---|---|---|---|
| 12/31/63 | Reserve | 234.97 | —— |
| 12/31/64 | Reserve | 253.09 | 256.86 |
| 12/31/65 | Reserve | —— | 275.37 |

I) Increase in reserve during 1964 on NLP Basis
   = 12/31/64 NLP Reserve – 12/31/63 NLP Reserve
   = 253.09 – 234.97
   = 18.12 (Reserve Strengthening)

II) Increase in reserve during 1964 due to Strengthening
   = 12/31/64 NLP–IPC Reserve – 12/31/64 NLP Reserve
   = 256.86 – 253.09
   = 3.77 (Reserve Strengthening)

III) Total Increase in reserve during 1964
   = 12/31/64 NLP–IPC Reserve – 12/31/63 NLP Reserve
   = 256.86 – 234.97
   = 21.89 (Normal Reserve Increase plus Reserve Strengthening)

IV) Total Increase in reserve during 1965
  = 12/31/64 NLP–IPC Reserve – 12/31/64 NLP–IPC Reserve
  = 275.37 – 256.86
  = 18.51 (Normal Reserve Increase-no Strenthening)

(c) Plaintiff's computation of Section 809(d)(5) deduction

*For 1964*

  = 10% x Total increase in reserve
  = 10% x 21.89
  = $2.189.

*For 1965*

  = 10% x Total increase in reserve
  = 10% x 18.51
  = $1.851.

(d) Defendant's Computation of Section 809(d)(5) deduction:

*For 1964*

  = 10% x increase in reserve on NLP (old) Basis
  = 10% x $18.12
  = $1.812

*For 1965*

  = 10% x Total increase in reserve + 10% x 1/10 x 1964 Reserve Strengthening
  = (10% x $18.51) + (10% x 1/10 x $3.77)
  = $1.851 + $.0377
  = $1.8887

———◆———

(e) The question presented to this Court in terms of the above hypothetical is whether plaintiff may deduct in 1964 (the year in which strengthening occurred) the entire $2.189, or whether plaintiff may deduct in 1964 only $1.812, representing its normal reserve increase in that year, and must spread the deduction allocable to reserve strengthening over the following ten years as done for 1965 at the rate of $.0377 per year.

## APPENDIX III

The difference in plaintiff's position and defendant's position on reserve strengthening attributable to a change in the reserve interest rate assumption is set forth below in the form of a hypothetical. Plaintiff made changes in certain of its reserve interest rate assumptions during 1965 and 1966. These changes were accompanied by changes in certain of the mortality tables which plaintiff had theretofore utilized, the effect of which was to weaken reserves by making the reserves smaller than it would have been had the changes not been made, and to reduce the amount of increase in reserves. For an analysis of the effect on reserves of a change in mortality table, see Appendix IV.

(a) Assume a $1,000 non-participating whole life contract issued in the year 1950 for a male, age 35, using the NLP–IPC method and the American Experience Mortality Table. Assume also that the December 31, 1964, reserve was calculated using an assumed rate of interest of three and one-half percent (3.-50%); and that the December 31, 1965, reserve was based on an interest rate of two and three-quarters percent (2.75%).

(b) *Computation*:

|  | 3.50% | 2.75% |
|---|---|---|
| 12/31/64 Reserve | 224.22 | ——— |
| 12/31/65 Reserve | 242.12 | 264.48 |
| 12/31/66 Reserve | ——— | 283.56 |

I) Increase in reserve during 1965 using 3.50% rate of interest
= 12/31/65 reserve (at 3.50%) − 12/31/64 reserve (at 3.50%)
= 242.12 − 224.22
= 17.90 (Normal Reserve Increase)

II) Increase in reserve during 1965 due to strengthening (change in interest assumption)
= 12/31/65 reserve (at 2.75%) − 12/31/65 reserve (at 3.50%)
= 264.48 − 242.12
= 22.36 (Reserve Strengthening Increase)

III) Total increase in reserve during 1965
= 12/31/65 reserve (at 2.75%) − 12/31/64 reserve (at 3.50%)
= 264.48 − 224.22
= 40.26 (Normal Reserve Increase plus Reserve Strengthening Increase)

IV) Total increase in reserve during 1966
= 12/31/66 reserve (at 2.75%) − 12/31/65 reserve (at 2.75%)
= $283.56 − $264.48
= $19.08 (Normal Reserve Increase—No Strengthening)

(c) Plaintiff's Computation of deduction under Section 809(d)(5) of the Code:

*For 1965*
= 10% x total increase in reserve
= 10% x $40.26
= $4.026

*For 1966*
=10% x total increase in reserve
= 10% x $19.08
= $1.908

(d) Defendant's Computation of deduction under Section 809(d)(5) of the Code:

*For 1965*
= 10% x Normal Reserve Increase (reserve calculated on old basis—interest rate of 3.50%)
= 10% x $17.90
= $1.79

*For 1966*
= 10% x total increase in reserve
+ 10% x 1/10 x 1965 Reserve Strengthening
= (10% x $19.08) + (10% x 1/10 x $22.36)
= $1.980 + $ .2236
= $2.1316

(e) The question presented to this Court is whether plaintiff may deduct the entire $4.026 in 1965 (the year *in which* strengthening occurred), or whether plaintiff may deduct only $1.79 representing the normal reserve increase in that year, and must spread the deduction allocable to strengthening over the following ten years as done for 1966 at the rate of $.2236 per year.

## APPENDIX IV

In 1965 and 1966 plaintiff changed certain of the mortality tables which it had theretofore used at the same time that it changed certain of the reserve interest rate assumptions which it had theretofore utilized. The changes in mortality tables reduced the amount of total reserve increase from the amount of increase which would have been achieved had the only change been in reserve interest rate assumptions. The difference in plaintiff's position and defendant's position on reserve weakening attributable to changes in mortality tables is below demonstrated in the form of a hypothetical.

(a) Assume a $1,000 non-participating single premium whole life policy issued in 1950 for a male, age 35, reserves being computed at an assumed rate of interest of 3.5% on the Net Level Premium-Immediate Payment of Claims (NLP–IPC) method. Assume further that the December 31, 1964 reserve was based on the American Experience Mortality Table and that the December 31, 1965, reserve was based on the 1941 C.S.O. Mortality Table.

(b) Computation:

|  | American Experience | 1941 C. S. O. |
|---|---|---|
| 12/31/64 Reserve | 511.76 | —— |
| 12/31/65 Reserve | 523.03 | 516.61 |
| 12/31/66 Reserve | —— | 528.44 |

I) Increase in reserve during 1965 using American Experience Mortality Table
= 12/31/65 Reserve (Am. Ex.) – 12/31/64 Reserve (Am. Ex.)
= 523.03 – 511.76
= 11.27

II) Decrease in reserve during 1965 due to reserve weakening
= 12/31/65 Reserve (Am. Ex.) – 12/31/65 Reserve (1941 C.S.O.)
= 523.03 – 516.61
= 6.42

III) Total increase in reserve during 1965
= 12/31/65 Reserve (1941 C.S.O.) – 12/31/64 Reserve (Am. Ex.)
= 516.61–511.76
= 4.85

IV) Total increase in reserve during 1966
= 12/31/66 Reserve (1941 C.S.O.) – 12/31/65 Reserve (1941 C.S.O.)
= 528.44 – 516.61
= 11.83

(c) Plaintiff's Computation of Section 809(d)(5) deduction
*For 1965*
= 10% x total increase in reserve
= 10% x $4.85
= $ .485

*For 1966*

= 10% x total increase in reserve

= 10% x $11.83

= $1.183

(d) Defendant's Computation of Section 809(d)(5) deduction [1]

*For 1965*

= 10% x increase in reserve on old (1941 C.S.O. Mortality Table) basis

= 10% x $11.27

= $1.127

*For 1966*

= 10% x total increase in reserve – 10% x 1/10 x 1965 reserve weakening

= (10% x $11.83) – (10% x 1/10 x $6.42)

= $1.183 = $.0642

= $1.1188

[1]. While defendant's position on this point (which is not in issue) is consistent with its position on the point in issue, Treas.Reg. § 1.809–5(a)(5)(iii) deals only with reserve increases and reserve strengthening, and provides no guidance in the instance where weakening has occurred.